## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | :    Hon. Cathy L. Waldor |
| | : |
| | :    Mag. No. 15-7200 (CLW) |
|        v. | : |
| | : |
| | :    **CRIMINAL COMPLAINT** |
| ALAA SAADEH | : |
| | : |

I, Suzanne Walsh, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

Special Agent Suzanne Walsh attested to this Criminal Complaint by telephone pursuant to Fed. R. Crim. P. 4.1(b)(2)(A)

Suzanne Walsh, Special Agent
Federal Bureau of Investigation

Sworn to by telephone pursuant to
Fed. R. Crim. P. 4.1(b)(2)(A)

June 26, 2015 at
Newark, New Jersey

Honorable Cathy L. Waldor
United States Magistrate Judge

Signature of Judicial Officer

## ATTACHMENT A

### COUNT 1

#### (Conspiracy to Provide Material Support
#### and Resources to a Foreign Terrorist Organization)

From in or about October 2014 to the present, in the District of New Jersey, and elsewhere, defendant

ALAA SAADEH

did knowingly and willfully conspire and agree with Co-conspirator 1 ("CC-1"), Co-conspirator 2 ("CC-2"), Samuel Rahamin Topaz, and with others, to provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), including services and personnel, to a foreign terrorist organization, namely the Islamic State of Iraq and the Levant, knowing that the organization was a designated terrorist organization, and that the organization had engaged and was engaging in terrorist activity and terrorism.

In violation of Title 18, United States Code, Section 2339B(a)(1).

## COUNT 2

### (Aiding and Abetting Attempt to Provide Material Support and Resources to a Foreign Terrorist Organization)

From in or about October 2014 to the present, in the District of New Jersey, and elsewhere, defendant

ALAA SAADEH

did knowingly aid and abet CC-1 in attempting to provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), including services and personnel, to a foreign terrorist organization, namely the Islamic State of Iraq and the Levant, knowing that the organization was a designated terrorist organization, and that the organization had engaged and was engaging in terrorist activity and terrorism.

In violation of Title 18, United States Code, Sections 2339B(a)(1) and 2.

## COUNT 3

### (Witness Tampering)

On or about June 13, 2015 to the present, in the District of New Jersey, and elsewhere, defendant

ALAA SAADEH

did knowingly and corruptly attempt to persuade Individual 1, with the intent to hinder, delay, and prevent the communication to law enforcement officers of the United States of information relating to the commission and possible commission of Federal offenses, including those in violation of Title 18, United States Code, Section 2339B(a)(1).

In violation of Title 18, United States Code, Section 1512(b)(3).

3

## ATTACHMENT B

I, Suzanne Walsh, being duly sworn, depose and say:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been for approximately 11 years.  I am currently assigned to the Joint Terrorism Task Force ("JTTF") and have worked on investigations relating to international terrorism and violent extremists since in or about 2006.  My experience as a Special Agent has included the investigation of cases involving the use of computers and the Internet to commit terrorism related offenses.  I have received training and have gained experience in interview and interrogation techniques, arrest procedures, obtaining electronically stored information through criminal process, search warrant applications, and the execution of searches and seizures.  I have also received training and information, and gained experience concerning terrorism crimes, as well as the tactics, techniques, and procedures used by terrorism suspects to evade detection.  I have personally participated in the execution of search warrants involving the search and seizure of computers and electronically stored information.

2.      As a federal agent, I am authorized to investigate violations of laws of the United States and execute warrants issued under the authority of the United States.

3.      I make this affidavit in support a criminal complaint charging defendant ALAA SAADEH ("SAADEH") with:  conspiring with CC-1, CC-2, Samuel Rahamin Topaz ("Topaz"), and with others, to provide material support

and resources to a foreign terrorist organization in violation of Title 18, United States Code, Section 2339B; aiding and abetting CC-1 in attempting to provide material support and resources to a foreign terrorist organization in violation of Title 18, United States Code, Sections 2339B and 2; and witness tampering, in violation of Title 18, United States Code, Section 1512(b)(3).

4.     The information contained in this affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers, and witnesses, and the review of documents and records.

5.     Because this affidavit is being submitted for the limited purpose of establishing probable cause for the Criminal Complaint, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the Criminal Complaint. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part. Dates of events in this affidavit are asserted as having occurred on or about the asserted date.

## PROBABLE CAUSE

### A.     Biographical Details and Overview of the Conspirators

6.     DEFENDANT SAADEH is a 23-year-old citizen of the United States and is currently a resident of New Jersey.

2

7.     CC-1 is a 20-year-old dual citizen of the United States and the Kingdom of Jordan, and until May 5, 2015 was a resident of Rutherford, New Jersey.  CC-1 is the brother of DEFENDANT SAADEH.

8.     CC-2 is a 20-year-old citizen of the United States and until recently was a resident of Queens, New York.  On June 13, 2015, CC-2 was arrested by the FBI/JTTF and charged in a criminal complaint filed with United States District Court for the Eastern District of New York with conspiring to provide material support to a foreign terrorist organization.

9.     Topaz is a 21-year-old citizen of the United States and is currently a resident of Fort Lee, New Jersey.   On June 17, 2015, Topaz was arrested by the FBI/JTTF and charged in a criminal complaint filed with this Court with conspiring to provide material support to a foreign terrorist organization.

**B.     Overview of ISIL**

10.  As a Special Agent of the FBI assigned to the JTTF, and based on my discussions with other federal agents, as well as my education, training, and experience, together with my review of open source information, I am aware of the following information:

a.     On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under Section 1(b) of Executive Order 13224.

b.      On May 15, 2014, the Secretary of State amended the designation of al-Qa'ida in Iraq ("AQI") as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under Section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  Although the group has never called itself "Al-Qaeda in Iraq (AQI)," this name has frequently been used to describe it through its history. To date, ISIL remains a designated FTO.

c.      ISIL is a violent foreign terrorist organization that has carried out mass executions, extrajudicial killings, and kidnappings targeting civilians. ISIL has killed and maimed children and committed rape and other forms of sexual violence.

d.      ISIL continues to operate in Iraq and Syria in its effort to establish an Islamic state in those countries.  In or about 2014, ISIL began referring to itself as the "Islamic State" and declared that it had established an Islamic caliphate in Iraq and Syria and has since urged Muslims to travel there to support ISIL's efforts to secure the territory ISIL claims to control.

e.      ISIL has recruited thousands of foreign fighters to Iraq and Syria from across the globe and used technology to spread its violent extremist

4

ideology and to incite others to commit terrorist acts in other countries. Numerous news reports have documented this activity and ISIL's use of propaganda videos to attract recruits. ISIL's recruiting videos show its fighters with assault rifles and other weapons and graphically depict them executing individuals it has captured.

      f.     Frequently, individuals who travel to join ISIL enter Syria by crossing the border from Turkey. Foreign fighters from Western countries often travel to locations in Turkey, including Istanbul, and then travel to towns close to the border with Syria where they are led or smuggled into Syria to join ISIL.

      g.     ISIL has published guidebooks containing tactics, techniques and procedures for its supporters to allow them to evade official scrutiny and potential arrest should they attempt to travel to Syria and Iraq. One technique is to avoid flying directly to Syria or Iraq, as well as to Turkey because its border with Syria has become known as a successful crossing point for numerous ISIL recruits. Another recommended tactic is to use a "cover story" of the kind that ISIL instructs foreign fighters to employ if questioned. ISIL also recommends that Western recruits present themselves as tourists so that they can pass scrutiny of officials as they travel to Syria and Iraq.

      h.     Beginning in 2014, using social media, ISIL has called for attacks against citizens – civilian and military – of the countries participating in the United States-led coalition against ISIL. For instance, on September 21, 2014, ISIL released a speech of Abu Muhammed Al-Adnani, a senior leader and official spokesman of ISIL. In this speech, entitled, "Indeed Your Lord is Ever

Watchful," Al-Adnani calls on Muslims who support ISIL from around the world to "defend the Islamic State" and to "rise and defend your state from your place where you may be." More recently, using social media, ISIL has been encouraging individuals to kill specific persons within the United States.

### C.   Individual 1 Reports Information to the FBI/JTTF about CC-1, DEFENDANT SAADEH, and Topaz

11.    On April 27, 2015, the FBI/JTTF was contacted by a New Jersey resident who stated he/she had information that CC-1, DEFENDANT SAADEH, Topaz, and others may be planning to travel overseas to join a foreign terrorist organization ("Individual 1").

12.    On April 28, 2015, Individual 1 was interviewed by members of the FBI/JTTF. During the interview, Individual 1 provided detailed information[1] about CC-1's recent radicalization and his support for ISIL and its violent agenda, as further summarized below.

a.    Individual 1 explained that he/she has maintained a close relationship with CC-1 and DEFENDANT SAADEH since in or about 2002. CC-1 and DEFENDANT SAADEH lived with Individual 1 for several years after CC-1 and DEFENDANT SAADEH's parents were deported from the United States after sustaining criminal convictions. As of the date of the interview, CC-1 and DEFENDANT SAADEH's father lived in Oman and their mother lived in Jordan.

---

[1] During physical surveillance conducted by the FBI/JTTF in late April and early May 2015, law enforcement officers observed CC-1 and DEFENDANT SAADEH spending significant amounts of time at Individual 1's residence in New Jersey, which is consistent with Individual 1 having intimate knowledge of their activities.

b.      CC-1 and DEFENDANT SAADEH lived together in Fort Lee, New Jersey (apart from Individual 1) from 2012 to 2014. In February 2015 they moved back in with Individual 1 in Rutherford, New Jersey.

c.      Beginning in late 2014 through the date of the interview, Individual 1 observed the following changes in CC-1's appearance and behavior, which along with CC-1's statements of support regarding ISIL and its violent agenda and his plans to travel abroad, motivated him/her to contact the FBI/JTTF. CC-1 became deeply and uncharacteristically invested in views and behaviors associated with Islam. In that regard, CC-1 frequently researched and reviewed Islamic writings and videos, and he often studied the Qur'an. He began to fast, and stopped drinking, smoking, and eating foods that were not permissible under Islamic law.  He wore heavy, dark eyeliner, and grew out his beard and dyed it red. He began praying five times a day and wore traditional Muslim attire in place of the Western clothing he had previously worn. CC-1's primary focus of conversation during this timeframe was about Islam, and he would become offended and agitated by any conversation or mention of any religion other than Islam.

d.      CC-1 began to spread his new-found zeal for Islam with other individuals. CC-1 converted a friend, whose name is "Sam," to Islam. "Sam" lived in Fort Lee, New Jersey. "Sam" told Individual 1 that the FBI came to his house. Based on the facts set forth in this Affidavit, Your Affiant submits that the "Sam" identified by Individual 1 is Topaz.

e.    CC-1's recent adoption of stringent religious behavior

coincided with his statements of support for ISIL and its violent agenda.

Within the past few months, Individual 1 heard CC-1 make numerous

statements in support of ISIL, which CC-1 "idolized," as well as other violent

extremists, including the following:

- CC-1 stated that ISIL fighters are his Muslim brothers.

- CC-1 stated that ISIL's recent execution of a captured Jordanian Air Force pilot by burning him alive was "justified" because the pilot was a traitor.

- CC-1 stated that the attack in Paris committed against the staff of a French satirical magazine in which several individuals were murdered earlier this year was similarly justified.

- CC-1 stated that the caliphate ISIL claimed to have established is a valid country, and not just a group.

- CC-1 stated that ISIL was a "state" that offered hospitals, schools, and protection for its people from the abuse of government.

- CC-1 stated that ISIL was the only group fighting for "freedom" that has never committed human rights atrocities.

- CC-1 stated that other governments have failed to protect their citizens, and were influenced to oppose ISIL by government and media propaganda.

f.    Individual 1 further stated that he/she had observed CC-1

conducting online research concerning ISIL on Individual 1's home computer.

CC-1 also posted messages supporting ISIL on his Facebook account.

g.    During the time period leading up to this interview,

Individual 1 observed that CC-1 became more withdrawn, rebellious, hostile,

and angry. He also became secretive. When asked, CC-1 refused to tell

Individual 1 where he was practicing Islam. In mid-April, CC-1 changed his

8

mobile telephone number from 201-258-9417 to 201-245-1125, and also changed service providers and devices. CC-1 began speaking more in Arabic rather than in English. Additionally, CC-1 ceased using Individual 1's computer in the residence, and instead was using his smartphone for all communications and online activities.

       h.    In April 2015, Individual 1 asked CC-1 to contribute money toward a new computer for his brother DEFENDANT SAADEH. CC-1 responded that he could not contribute because he was saving all his money for something. Although he began to say what he was saving for, he "caught himself" and stopped. Individual 1 described that CC-1 had a "guilty" look on his face at the time. Following this episode, CC-1 moved a majority of his clothing and belongings out of the shared residence.

       i.    Additionally, DEFENDANT SAADEH also ceased use of Individual 1's computer, as he obtained his own laptop. DEFENDANT SAADEH and CC-1 began having their conversations in Arabic, which Individual 1 does not speak, when Individual 1 was around even though Arabic was not DEFENDANT SAADEH's primary language.

       j.    On April 20, 2015, DEFENDANT SAADEH informed Individual 1 that the deli where CC-1 had been working was to be sold imminently, and that CC-1 had decided to travel to Jordan to study. DEFENDANT SAADEH advised Individual 1 that CC-1's father, who resides in Oman, had planned to send money to CC-1 so that he could purchase his airline ticket to Jordan. DEFENDANT SAADEH further stated that CC-1 was

9

already packed, and was prepared to fly to the Middle East "almost immediately."

        k.     Around this time, CC-1 told Individual 1 that he wanted to study theology overseas in the Middle East. This made Individual 1 suspicious because CC-1 had never been very studious.

        l.     On April 22, 2015, Individual 1 spoke to another individual who for years has also maintained a close relationship with CC-1 ("Individual 2"). Based on information provided by Individual 2, Individual 1 reported that CC-1 intended to travel onward from Jordan to Turkey and to other countries in the Middle East in order to help his Muslim brothers. CC-1 further explained to Individual 2, who in turn relayed the information to Individual 1, that CC-1 was unable to do good here in the United States and that he needed to go abroad.[2]

        m.     Following these discussions with Individual 2, Individual 1 observed CC-1 spending more time away from Individual 1's home. CC-1 returned to Individual 1's home periodically to remove the remainder of his belongings and to speak with DEFENDANT SAADEH. On these occasions,

---

[2] On May 3, 2015, Individual 2 was interviewed by the FBI/JTTF and provided the following information. Individual 2 has had a close, personal relationship with CC-1 and DEFENDANT SAADEH for many years. CC-1 and DEFENDANT SAADEH have been living with Individual 2 and Individual 1 in Rutherford, New Jersey. Individual 2 observed a significant change in CC-1's behavior. CC-1 is intensely religious, constantly speaks about religion, and speaks in Arabic with DEFENDANT SAADEH when Individual 2, who does not speak Arabic, is present. CC-1 told Individual 2 that after he goes to Jordan he is going to Turkey and then to other unspecified countries.

Individual 1 observed that CC-1 and DEFENDANT SAADEH engaged in cryptic dialogue, or otherwise whispered to one another in Arabic, which was unusual in comparison with Individual 1's prior observations of the brothers' communications with one another.

n.  Similarly, Individual 1 observed that DEFENDANT SAADEH has been secretive with his telephone communications, as he frequently walked away from Individual 1 and the shared common area in the home in order to speak Arabic. According to Individual 1, this behavior was unusual in comparison with how DEFENDANT SAADEH had historically acted and communicated with others in Individual 1's presence.

o.  Despite DEFENDANT SAADEH's apparent efforts to hide his communications from Individual 1, on April 24, 2015, Individual 1 overheard a telephone conversation in which DEFENDANT SAADEH was speaking with someone in English. During that conversation, he/she heard DEFENDANT SAADEH state that:

- CC-1 is leaving the United States soon;
- DEFENDANT SAADEH is "on the fence" about traveling and so is "Sam";
- DEFENDANT SAADEH's and CC-1's father in Oman "knows"; and
- DEFENDANT SAADEH's and CC-1's mother in Jordan "does not" know.

p.  Furthermore, CC-1 recently shaved off his beard. CC-1 said that he did so because he did not want to be harassed by officials on his way to Jordan. Your Affiant notes that this and other changes in CC-1's appearance

11

as reported by Individual 1 are consistent with ISIL's guidance to recruits that they should appear as Western tourists when traveling to Syria and Iraq to evade official scrutiny.

13.     After his/her initial interview, Individual 1 again contacted the FBI/JTTF to provide updates about CC-1 and DEFENDANT SAADEH. For instance, on April 30, 2015, Individual 1 informed the FBI/JTTF that he/she had a "going-away" dinner for CC-1. DEFENDANT SAADEH attended the dinner, as did a friend of CC-1 whom CC-1 had recently persuaded to convert to Islam and who is not CC-2 or Topaz. On the evening of the dinner, the friend stated that CC-1's travel plans were "inspiring and courageous" and that the friend was unsure whether he could do the same as CC-1 but that he (the friend) would like to do so. Individual 1 provided photos taken at the "going away" dinner that show CC-1, DEFENDANT SAADEH, Individual 1, Individual 2, and CC-1's friend gathered at a restaurant. Notably, CC-1 is clean shaven and wearing modern clothing, which is consistent with the sudden change CC-1 made to his appearance in the days leading up to his travel as reported by Individual 1 (see paragraphs 12(c) and (p), above).

14.     On May 2, 2015, Individual 1 advised the FBI/JTTF of the following information:

- CC-1 and DEFENDANT SAADEH were talking about traveling and DEFENDANT SAADEH was beginning to get swayed by CC-1;
- CC-1 and DEFENDANT SAADEH referred to the names of other people in Arabic in relation to traveling and CC-1 said that a third person would "get [DEFENDANT SAADEH] there one way or another, inshallah [transl., "God willing"]."

12

- CC-1 and DEFENDANT SAADEH were looking at a map of the globe as they discussed their travel and were viewing pictures of "Arab men" with military gear;

- CC-1 and DEFENDANT SAADEH referred to the United States as having concentration camps for Muslims;

- CC-1 has been "taking an active role in recruiting" and "has a contact here."

**D.    Individual 3 Reports Information
        to the FBI/JTTF about TOPAZ, CC-1, and CC-2**

15.    On January 17, 2015, the FBI/JTTF interviewed a New Jersey resident who has maintained a personal relationship with Topaz for several years ("Individual 3"). Individual 3 advised the FBI/JTTF of the following:

a.    Individual 3 was worried about Topaz because of "what is going on overseas." Individual 3 was also concerned about two of Topaz's friends and is afraid that Topaz's friends might convince him to travel overseas and "do something stupid." As a result, Individual 3 took Topaz's passport and hid it.

b.    Individual 3 could not identify Topaz's two friends by name but said they lived on a certain street in Fort Lee, New Jersey, which matches where CC-1 and DEFENDANT SAADEH lived at the time of the interview. In addition, Individual 3 provided phone numbers for the friends, which subsequent investigation revealed matched DEFENDANT SAADEH's phone number and CC-1's phone number except for one digit.

16.    On April 15, 2015, Individual 3 was interviewed again by the FBI/JTTF and provided the following information:

13

a.  Individual 3 continues to be concerned about Topaz's friends influencing him, including an individual later identified as CC-1. On this date, CC-1 and Topaz were together as recently as the day before the interview.

b.  Two weeks earlier (approximately), Topaz brought a male individual, later identified as CC-2, to Individual 3's home who stayed the night. CC-2 and Topaz prayed together several times while in Individual 3's home. CC-2 made Individual 3 feel very uneasy around him.

c.  CC-1 and CC-2 are "trying to recruit" Topaz and are "preying" on Topaz's insecurities and "pain." Topaz has become distant from his high school friends who were a good influence on him.

d.  Individual 3 took Topaz's passport away but Topaz asked for it back because he said he needed it to get a driver's license.

17.  On May 1, 2015, Individual 3 was interviewed again by the FBI/JTTF and provided the following information:

a.  Individual 3 has been trying to persuade Topaz to attend community college but Topaz refuses to do so because he does not see a future for himself in the United States. Topaz also stated that "they" promised him $7000 a week and that he could have four wives. Individual 3 believes that Topaz is referring to overseas, either Iraq or one of the other Middle East countries. Topaz keeps saying it is a rich country because "they" are "taking over everything." Topaz has been praying "night and day" and also fasting.

b.  Topaz currently has his passport back but has not obtained a driver's license as he said he would. Individual 3 is afraid to ask for the

14

passport because Topaz is talking about going overseas and Individual 3 doesn't want to make Topaz angry to the point that he will not confide in him/her anymore.

      c.    One week earlier, CC-1 showed up at Individual 3's home at 3:00 a.m. and he and Topaz started praying and calling each other brother. Individual 3 told CC-1 to leave Topaz alone and that he was causing problems in Topaz's family.  CC-1 showed up again the following day.

      d.    CC-1 kept showing Topaz videos "of what is going on overseas."

      e.    Individual 3 overheard CC-1 and Topaz talking in a happy way about the fact that "they" took over a town and the people are so scared that the police even left their uniforms in the middle of the street.

      f.    CC-1 and Topaz discussed obtaining a credit card for Topaz.

      g.    Topaz recently deleted his Facebook account.

      h.    CC-1 was influencing Topaz, but Individual 3 believes CC-2 is the "leader."

      i.    CC-1 indicated he was leaving the following week (*i.e.*, the week of May 3, 2015), in order to travel to Jordan to visit his parents. Individual 3 believes that there is a larger group who are all traveling overseas. Individual 3 believes that Topaz still has intentions to go overseas but does not know when.

**E.    CC-1's Mother and**
**Others Plead for Him Not to Join ISIL**

18.    As revealed by a search warrant obtained by the FBI/JTTF, on

April 21, 2015, an individual sent the following messages to CC-1 via a social

media service, which in turn delivered them to the targeted e-mail account.

According to a draft translation by the FBI/JTTF, the individual wrote:

> [CC-1], my dear, how are you? I miss you very much[.]
>
> Yesterday, your mother called me. She was crying and was subdued
> because of your issue. She said that you want to travel to Turkey and
> join a group of people you do not know who they really are. They seduce
> you under the flag of Islam, but when you get to them, you see things
> that make you hate your situation. Many young men left here and went
> to them. However, when they saw the situation there, they escaped and
> said: "We witnessed humiliation, insult, poverty, hunger and cruel acts
> that have nothing to do with Islam and the religion."
>
> My dear, please, think about it. We all love you and we are not satisfied
> with your way of thinking. If you aim at the afterlife, you should obtain
> your parents' satisfaction, build a family and make us happy.
>
> May God be pleased with you, do not torture us because you are loved by
> all the people[.]

In addition, the following messages to CC-1 sent by his mother on the same

day were recovered in the search of CC-1's e-mail account:

- "[CC-1] do not listen to them they liers [sic]"

- "[CC-1] do not go anywhere if u love me dont [sic] kill your mom"

- "Dont kill my smile[.] i want be happy all the time do not leave me do
  not go to them[.] stay with [name of CC-1's mother omitted]"

Finally, yet another individual sent the following message to CC-1 on the same

day, which according to a draft translation by the FBI/JTTF reads:

> [CC-1], how is everything with you guys? I hope you are doing fine, God
> willing.  I heard something strange and you are smart and clever enough

16

to assess matters. If you go without your parents' approval, Jihad will not be accepted from you.  Did not you hear the hadith of the Prophet, God's blessing and peace be upon him? With whom are you going?  With Da'ish [referring to ISIL by its Arabic acronym], the criminals who are slaughtering our people in Syria in Yarmouk Camp [referring to refugee camp in Syria]?  Man, we live in the era of seditions that are like flocks of a dark night which the Prophet, God's blessing and peace be upon him, mentioned.  Stay home and let go.  Fear God in your mother and seek her approval.  Listen to me, my dear. I have been through the same thing like you.  You will grow up and realize that I was right.  Believe me, my dear, the time of jihad is not with those people. God willing, my God will bless us with the right martyrdom in the Land of Rabat, Jerusalem. Listen to my advice now, my dear.  What exists now is seditions like flocks of a dark night.  Beware of joining those people who do not fear God.  God knows best and He is the wisest. Be alert, Da'ish [referring to ISIL by its Arabic acronym] is made by the cursed West.  I hope, my dear, that you will listen to the advice.

**F.**     **DEFENDANT SAADEH's Assistance to CC-1 in Obtaining Money and an Airline Ticket In Furtherance of the Conspiracy**

19.     On April 30, 2015, a ticket was purchased in CC-1's name using DEFENDANT SAADEH's credit card on Royal Jordanian Airlines, Flight #262, scheduled to depart John F. Kennedy International Airport on Tuesday, May 5, 2015, at 10:30 p.m., to Queen Alia International Airport in Amman, Jordan. Earlier that day, law enforcement officials observed DEFENDANT SAADEH drive CC-1 to a Western Union in Rutherford, New Jersey.  Records from Western Union reveal that CC-1 picked up $233.77 (USD) that had been wired to him from Oman by his father.  Video of the transaction at the Western Union shows DEFENDANT SAADEH with CC-1 when he picked up the money.

### G.    CC-1's Travel to Jordan on May 5, 2015

20.    On May 5, 2015, CC-1 made his final preparations for his trip while at a residence in New Jersey.  DEFENDANT SAADEH and CC-2 were present at that time.

21.    A few hours before CC-1's flight, CC-1, CC-2, and DEFENDANT SAADEH came out of the residence and got into a car with Individual 1 and they all set out for the airport.  During the drive to the airport, CC-1, DEFENDANT SAADEH, and CC-2 made several statements about their plans to travel abroad together, which were lawfully recorded by the FBI/JTTF. Specifically, the following exchange occurred during the car ride:

| | |
|---|---|
| CC-1: | I love you, [Individual 1]. |
| Individual 1: | I love you too. I'm gonna miss you so much… [To CC-2] You going to miss him too? |
| CC-2: | Yeah.  Well we're gonna see each other soon – |
| CC-1: | Exactly.  We're gonna see each other soon.  All of us. Insh'allah [*transl.* "God willing"]. |

A few minutes later, DEFENDANT SAADEH stated that when he leaves the United States he is never coming back.  Then the following exchange occurred:

| | |
|---|---|
| Individual 1: | [To CC-2] So are you going back to Jordan at some point? |
| CC-2: | Ah – |
| CC-1: | Very soon. |
| Individual 1: | Very soon?  When? |
| CC-1: | He doesn't know exactly. |
| CC-2: | A few months maybe. |

Individual 1:     Really?

CC-1:             No.  A few weeks.

CC-2:             [Chuckles].

Individual 1:     A few weeks?

CC-1:             [To CC-2] You better.  You better come in a few weeks.

CC-2:             A few weeks [stammers] A few months maximum. [stammers]  Because I got to [stammers] People have to [stammers, and trails off].  I have promises to keep.

Individual 1:     In Jordan?

CC-2:             Here and in Jordan and other places.

CC-1:             Yeah.

Individual 1:     Cool.  Where you gonna go?

CC-2:             [Inaudible]

CC-1:             Same place.  Yeah.  [CC-2] is gonna bring Sam [referring to TOPAZ], uh, and him [referring to DEFENDANT SAADEH], and our other brother [referring to an unidentified male] too.   We're trying to bring everybody and reunite each other.

CC-2:             Like a holiday [Chuckles].

Individual 1:     Really?

CC-1:             Yeah.

Individual 1:     Have all the guys –

CC-1:             Like a holiday.

Individual 1:     – there?  For what holiday?

CC-1:             Nah, nah.  *Like* a holiday.  We're gonna –

CC-2:             It's *gonna* be a holiday. [Laughs].

CC-1:             Yeah.  It's gonna be awesome.  Yeah, yeah.  We're just gonna unite everybody, Insh'allah.

19

Individual 1:      You guys all gonna be together . . . .

CC-1:           Yeah . . . .

Throughout this conversation, CC-1 and CC-2 claimed that the place they, DEFENDANT SAADEH, Topaz, and the unidentified male would be traveling to is Jordan.

22.     Upon their arrival at the airport, DEFENDANT SAADEH and CC-2 accompanied CC-1 into the terminal. Individual 1 then entered the terminal and met with CC-1, DEFENDANT SAADEH, and CC-2. CC-1 had previously told Individual 1 that he wanted to sell his smartphone to him/her but he had not yet done so. Individual 1 offered to buy the phone from CC-1 consistent with their earlier conversation and CC-1 agreed to sell it to him/her for $200. As CC-1 and Individual 1 exchanged money for the phone, DEFENDANT SAADEH asked CC-1 to hand the phone over to him. CC-1 did so, at which time DEFENDANT SAADEH removed the SIM card from CC-1's phone. DEFENDANT SAADEH then handed CC-1 the SIM card and handed Individual 1 the phone. CC-2 was present for and observed this exchange. Later, during the ride home from the airport, DEFENDANT SAADEH again asked for CC-1's phone in an apparent effort to reset it. Your Affiant submits that this behavior is consistent with a coordinated effort to prevent incriminating evidence stored on the phone and/or on the SIM card, including text messages, e-mails, and other electronic communications, as well as ISIL-related materials, from falling into the control of Individual 1 and/or law enforcement.

23.     CC-1 received his boarding pass and proceeded through security checkpoints to the gate.  At approximately 9:40 p.m., CC-1 boarded his scheduled flight to Amman, Jordan, which later departed JFK as expected.

**H.     Activities of DEFENDANT SAADEH, CC-2, and Topaz Following CC-1's Travel to Jordan**

24.     On May 6, 2015, the day after seeing CC-1 off on his flight, CC-2 travelled to New Jersey and met with Topaz in Fort Lee and spent several hours with him in public and at Topaz's residence.

25.     On May 7, 2015, DEFENDANT SAADEH met with the Individual 1 in Jersey City, New Jersey.  At the direction of the FBI/JTTF, Individual 1 recorded their conversation.  During that conversation, DEFENDANT SAADEH stated that he had spoken to CC-1 about his arrival and current situation in Jordan.  According to DEFENDANT SAADEH, CC-1 was questioned by Jordanian authorities upon arrival about the reason for his travel.  CC-1 told them he had come to Jordan to go to school but ran into trouble because had no documents to prove this.  DEFENDANT SAADEH stated that CC-1 left his school papers back in the United States.

26.     DEFENDANT SAADEH discussed ISIL in this conversation.  Among other things, DEFENDANT SAADEH stated:

- ISIL has established a caliphate and a government that is building schools and hospitals;

- ISIL has taken over the "important parts" of Iraq;

- Western media depictions of ISIL atrocities, such as mass killings of women and children, were "overblown;"

21

- The media ISIL puts out is not manipulated and show the truth of ISIL's activities;

- ISIL's beheadings of people are not random acts but are justified;

- The attackers in Garland, Texas[3] were individuals who attempted to travel overseas to join ISIL but were unsuccessful; and

- The Garland attackers were justified in doing what they did because it is wrong to depict the Prophet.

27.    DEFENDANT SAADEH further stated that he and CC-2 want to travel to Jordan.  DEFENDANT SAADEH stated the following:

- Given the state of the world we live in currently everyone is going to stand up now and no one is going to stay quiet;

- DEFENDANT SAADEH felt that something crazy was going to happen ever since he was a child and now everything crazy is happening;

- DEFENDANT SAADEH is "going to do what I have to do" and if he did not do so it would go against his own religion;

- There is more to life than continuing with school.

28.    On May 12, 2015, Individual 3 spoke again with members of the

FBI/JTTF.  During the interview, Individual 3 stated that when he/she asked

Topaz what he thought about ISIS (i.e., ISIL), Topaz responded that it was not

bad because they are protecting what they believe in and that news in the

United States is corrupted.   Individual 3 further stated that one of Topaz's

friends, later identified as CC-2, had been to Individual 3's house twice, that

---

[3] On May 3, 2015, two men armed carrying assault rifles were shot and killed by a law enforcement officer at an event in Garland, Texas according to open-source reports.  The event was advertised to include displays of depictions of the Prophet Muhammad.  In Your Affiant's training and experience, depicting the Prophet in drawings or photographs is generally considered a major sin in Islam.

Individual 3 had taken his picture, and that CC-2 left the house after his picture was taken and has not returned.  Individual 3 further stated that he/she had again taken Topaz's passport and provided it to a third-person to keep it from Topaz so that he could not use it to travel to join ISIL.

29.     On May 15, 2015, Individual 1 reported to the FBI/JTTF regarding his/her communications with DEFENDANT SAADEH.  Specifically, DEFENDANT SAADEH's father had called DEFENDANT SAADEH and told him that CC-1 has been detained for five days in solitary confinement. DEFENDANT SAADEH's father advised DEFENDANT SAADEH that he should delete everything off his phone and to be careful who he talks to and who he meets.  DEFENDANT SAADEH's father, according to Individual 1, thinks CC-1 is in this situation because of something that was caused by the United States. DEFENDANT SAADEH thought that he had been in CC-1's place, he would have been better prepared to deal the Jordanian authorities and more successful at manipulating his way out of that situation.  DEFENDANT SAADEH advised Individual 1 that he was glad he/she had acquired CC-1's phone before he traveled because DEFENDANT SAADEH and CC-1 had communications with each other regarding ISIL over that phone.  DEFENDANT SAADEH further stated that ISIL's violent actions are justified.

30.     On May 21, 2015, court-authorized electronic surveillance revealed the following text exchange between DEFENDANT SAADEH and Topaz:

DEFENDANT:     Yu [sic] Talk to my brother [referring to CC-1]?

Topaz:          Nah I haven't, Ive [sic] been trying to talk to [CC-2] to see if he knows anything but he's not sure either[.]

23

| | |
|---|---|
| DEFENDANT: | Lay low[.].  And don't talk to nobody[.] |
| Topaz: | I know that bro[.] I've very very low and that's another thing bro[.] we gotta talk about hijra[4] but only when I see you obvi[.] |
| DEFENDANT: | When yu [sic] free[?] |
| Topaz: | Right now tbh [abbreviation for "to be honest"] anytime |
| DEFENDANT: | Yu don't work[?] |
| Topaz: | Not right now, My cousin wants me to work for him in the city down by canal st[.] I'll probably be working within a week[.] But I have money . . . [.] |

Based on my training, experience, and knowledge of this investigation, I believe DEFENDANT SAADEH's direction to Topaz to "lay low" and not to speak with anyone specifically refers to refraining from taking action in furtherance of the conspiracy to provide material support to ISIL that might be detected by law enforcement.  I further believe that Topaz's reference to "hijra" in this context and to having money indicates that Topaz has the intention to travel to join ISIL in support of the conspiracy.  Notably, DEFENDANT SAADEH did not ask Topaz to explain what he meant by "hijra" or having money, which is consistent with DEFENDANT SAADEH having knowledge of and being a member of the conspiracy to provide personnel and services to ISIL.

---

[4] "Hijra" is an Arabic word (commonly transliterated as "Hijrah") that literally translates into English as "migration."  However, Your Affiant is aware that the term has been used by defendants in terrorism cases investigated by the FBI to refer to traveling from Western countries to join foreign terrorist organizations and violent extremist groups.  Additionally, one of the English-language manuals released by ISIL in 2015 containing guidance for Western recruits to evade detection feature "Hijrah" in the manual's title.

31.    On May 22, 2015, a telephone call recorded pursuant court-authorization occurred between DEFENDANT SAADEH and another individual in which they discussed CC-1's detention overseas.  During the call, DEFENDANT SAADEH stated "somebody snitched on him [referring to CC-1] . . . one of his friends snitched on him." He then stated that he hoped it was not CC-2 or Topaz who "snitched" on CC-1 and "I'm hoping it's not because if it is . .. I think I'm going to kill someone." DEFENDANT SAADEH further stated he and another individual "gave him [referring to CC-1] the money" and that he told CC-1 not to travel on his Jordanian passport.  DEFENDANT SAADEH further stated: "I kept telling him, [CC-1, CC-1], hide.  Go on the low radar."

32.    After this call, DEFENDANT SAADEH had another call, which was recorded pursuant to court authorization.  In this second call, which was with another individual, DEFENDANT SAADEH again stated that someone "snitched" on CC-1 and that as a result he was facing years of jail time in Jordan.  The other participant on the call stated:  "I don't want to say I told you so . . . ." to which DEFENDANT SAADEH responded, "this is what Alaah wants."

33.    On May 31, 2015, CC-2 and Topaz exchanged multiple text messages and phone calls about meeting one another that day in lower Manhattan.  Specifically, CC-2 directed Topaz to arrive by a particular time and to meet him at a subway station a few blocks from the World Trade Center. Topaz later confirmed his arrival in Manhattan and reconfirmed the meeting location with CC-2.

34.    On May 31, 2015, DEFENDANT SAADEH spoke in person with
Individual 1 about CC-1's situation in Jordan.  DEFENDANT SAADEH
explained that CC-1 is in custody in Jordan because he had sent DEFENDANT
SAADEH a link to an ISIL video via text message.  DEFENDANT SAADEH
further stated that DEFENDANT SAADEH's and CC-1's father is trying to get
CC-1 released.  Responding to Individual 1's question whether the father will
bribe the officials, DEFENDANT SAADEH stated that a bribe will not work
because CC-1's case relates to "national security."  DEFENDANT SAADEH
further stated that ISIL is a major threat to the Middle East right now, and that
every government is afraid that ISIL will expand and take over their territory.

35.    On June 2, 2015, during a court-authorized electronic surveillance
revealed, DEFENDANT SAADEH told another individual that he thinks he is
being followed by the FBI and that this is connected to the discovery of material
stored on CC-1's phone by authorities.

36.    On June 13, 2015, Individual 1 had a consensually recorded
conversation with DEFENDANT SAADEH, which revealed DEFENDANT
SAADEH's knowledge of CC-1's plans to join ISIL.  During the conversation,
Individual 1 stated that CC-1 had told him/her, as well as Individual 2, that he
(CC-1) supported ISIL and intended to travel to join ISIL in Syria and/or Iraq.
DEFENDANT SAADEH explained that CC-1's motivation for this was to live
under Sharia law and as opposed to the United States where behavior
considered by Muslims to be sinful was prevalent and condoned.  DEFENDANT
SAADEH further stated that CC-1 told him his plan was to travel there and

26

that if after joining ISIL he disagreed with their activities he would come back. When asked if he had tried to discourage CC-1, DEFENDANT SAADEH stated he did not discourage him and that he is not the kind of person to discourage anyone. DEFENDANT SAADEH further stated that he himself wants to "pick up my life and go to Jordan, or go overseas and go live over there." When asked by Individual 1 if he would go to "Iraq and Syria to that zone to that [referring to ISIL]" DEFENDANT SAADEH replied, in part: "If I think they're good, why not?" DEFENDANT SAADEH further stated that America and other nations oppress their own people and for this reason he considers them to be terrorists.

37.    This conversation began inside Individual 1's house, however, at one point Individual 1 asked DEFENDANT SAADEH to be straight with him/her about what he/she should say to the FBI about CC-1's plans to join ISIL if the agents tried to interview him/her. DEFENDANT SAADEH replied: "I don't want to be straight, I don't know who's listening." He and Individual 1 then continued the conversation outside to address DEFENDANT SAADEH's concern that the house was bugged by the FBI. Once outside the following conversation took place:

| | |
|---|---|
| Individual 1: | So what do I say? |
| DEFENDANT: | You just play stupid. |
| Individual 1: | Okay. |
| DEFENDANT: | Like you just really don't know. That all you know is that he [referring to CC-1] was going to see his parents. |

| Individual 1: | What if they ask me about . . . you know, the stuff that he [referring to CC-1] was talking about or, or, I mean what do I – |
| DEFENDANT | Just that he never talked to you about it. . . . Just be like, "He talked to me about going to Jordan" and "his father told him to come see him." . . . |
| Individual 1 | So just stay, try to stay as quiet as possible? |
| DEFENDANT | Yeah.  Just play stupid. |

Individual 1 then asked what to do about Individual 2 if he/she was questioned by the FBI.  DEFENDANT SAADEH directed Individual 1 not to permit the FBI to interview Individual 2 and to make up an excuse as to why.  DEFENDANT SAADEH added that Individual 2 is good at acting and that "[Individual 2] can act better than you."  Later, when Individual 1 came back to the topic of CC-1's interest in joining ISIL, DEFENDANT SAADEH cut him/her off, stating: "Forget it.  No, you.  Just forget it.  Don't ever bring it up.  Don't ever talk about it. Pretend it never happened."

38.    In this conversation, DEFENDANT SAADEH also made statements supportive of ISIL and other violent extremists.  For instance, DEFENDANT SAADEH stated that he, CC-1, and others watched a video in which ISIL fighters claimed to have defeated Iraqi military forces despite being significantly outnumbered.  DEFENDANT SAADEH stated that this improbable victory led him to believe that ISIL's fighters were protected by God.  Later, in the conversation, DEFENDANT SAADEH stated that he believed that ISIL's execution of a Jordanian Air Force pilot was justified, although he not agree with the method of his execution.  Finally, DEFENDANT SAADEH referred to

28

Dzhokhar Tsarnaev, the convicted Boston Marathon bomber, and stated that he did not believe Tsarnaev bombed anyone and that he was "framed" by the FBI. DEFENDANT SAADEH stated that CC-2, who as explained in paragraph 51 below admitted being a "full-fledged" member of ISIL, "is a good kid."

39.     On June 17, 2015, following media reports of CC-2's arrest, Individual 1 had a consensually recorded conversation with DEFENDANT SAADEH, in which DEFENDANT SAADEH again directed Individual 1 to lie about CC-1's extremist ideology and plans to join ISIL:

DEFENDANT:      If they [referring to the FBI] do come – straight up – tell them what it is about me.  When it comes to [CC-1] just say "I don't know.  What I know is he is like this but that's all I know."

Individual 1:      So I shouldn't tell them about the way he was acting and what he was saying.  Don't say that?

DEFENDANT:      No.  Nothing like that.  Just be like, "Honestly, I don't know.  His brother told me that they want him to go to Jordan to be with his parents and family and said that it's better for him."  And then that's it.

Later the in the conversation, Individual 1 returns to the topic of what to tell the FBI about CC-1, as follows:

Individual 1:      So if they ask me about [CC-1], what do I say again?

DEFENDANT:      You tell them, his personality, how he was.  "He worked.  He was just a normal kid.  Blah, blah, blah."

Individual 1:      Honey, if I tell, uh –

DEFENDANT:      That's it!  That's how you knew him.  That's the point.

Individual 1:      Yeah, but –

DEFENDANT:      "Yeah, but," what?

29

| | |
|---|---|
| Individual 1: | You know – the other, the other stuff about what he was saying about ISIS and the – |
| DEFENDANT: | [Cuts Individual 1 off] If he's just talking [pause] you could easily just say that [pause] you really didn't know anything.  That the person you know is just who [CC-1] was.  That's it. |
| Individual 1: | Okay.  So I should just say, "I don't know anything." |
| DEFENDANT: | Yeah.  When it comes to that stuff?  Yeah.  You be like, "All I know is this, this, "He cooked.  He was a messy kid."  Stupid shit.  And that's it." |
| Individual 1: | So don't say anything about ISIS whatsoever? |
| DEFENDANT: | When it comes to that, be like, "Look, uh.  He prayed.  And I never saw anything else other than that." |
| Individual 1: | Okay. |
| DEFENDANT: | And that's it.  Keep it, like, honest up to a point.  You know? . . . "He was a kid.  He went to work.  He came home."  That's it.  That's all you know.  "He was a sweet kid.  The only thing I can say is he prayed." |
| Individual 1: | Okay. |
| DEFENDANT: | That's it.  [Pauses, then states in an affected accent] Dats eet.  Nada mas.  You understand? |
| Individual 1: | I got it. |

40.    Later that same day, DEFENDANT SAADEH received a phone call

from CC-1's friend who had attended CC-1's "going away" dinner and had said

that CC-1's overseas travel plans were "inspiring and courageous" (*see*

paragraph 13, above).  During the call, which was recorded pursuant to court-

authorization, the friend stated that law enforcement officers interviewed him

earlier in the day about CC-1, CC-2, Topaz, and DEFENDANT SAADEH.  He

then proceeded to describe to DEFENDANT SAADEH the officers' questions and

what he told them.  The friend stated:  "Like, they wanted me to tell them [CC-1]'s intentions and shit.  And I'm, like . . . I'm like, I'm like, 'No, no, [CC-1] just wanted to go,' uh, 'he got in obviously,' but I'm just like, 'nah, nah, he didn't go over there to fight, he went over there to,' um, 'be part of a Muslim country, like that, that was like a dream to him. . . ."  The friend further stated that he did not get the feeling that the officers thought he was "bullshitting them."  Later in the conversation the friend stated that "I, I, I gave them truth while bullshitting them, like, with some information, I'm like 'he [CC-1] just wants to join the Islamic State.'"  DEFENDANT SAADEH then stated:

| | |
|---|---|
| DEFENDANT: | But, that, that's not why he, he went. . . . He went to Jordan with my parents. |
| Friend: | Huh? |
| DEFENDANT: | He didn't even go there, my [n-word], he went to Jordan with my parents.  Like, you saying that [referring to CC-1 wanting to join ISIL], that, that is not truthful things. |
| Friend: | That's enough what?  That's what? |
| DEFENDANT: | That's not truthful things. |
| Friend: | I'm listening.  Okay.  I got you. |
| DEFENDANT: | Because he didn't go over there, he went to go to Jordan with my parents." |
| Friend: | Mhm. |
| DEFENDANT: | You know, that was the plan my father and I came up with.  You get me?  Like – |
| Friend: | Yeah, and that plan was, that plan was made, you know? |
| DEFENDANT: | Yeah. |

| | |
|---|---|
| Friend: | I get you, bro.  I get you. |
| DEFENDANT: | You know.  And, then, that, that [n-word] [CC-2], whatever he deserves, whatever he did, if he deserves this [referring to CC-2's arrest for conspiring to provide material support to ISIL], he deserves it.  And – |
| Friend: | Everybody gets what they deserve, bro.  Everybody gets what they deserve.  That's not here.  That's not, yeah. |

41.    On June 19, 2015, Individual 1 had a consensually recorded conversation with DEFENDANT SAADEH and another individual, which took place shortly after the public announcement of Topaz's arrest.[5]  In the conversation, DEFENDANT SAADEH, who had previously made favorable statements about CC-2 and had told Individual 1 he was planning to travel overseas with CC-2, blamed CC-2 for influencing CC-1 and Topaz to support ISIL.  DEFENDANT SAADEH further stated that CC-2 is "crooked." DEFENDANT SAADEH acknowledged having previously told Individual 1 that he (DEFENDANT SAADEH) supported violent acts committed by ISIL, including beheadings and the execution of the Jordanian pilot and stated that he no longer believed this.  DEFENDANT SAADEH repeatedly explained that he helped send CC-1 overseas because he believed CC-1 was succumbing to radical influences and was on a trajectory to either join ISIL or become involved in an ISIL-inspired plot if he (DEFENDANT SAADEH) did not send CC-1 to Jordan to be with their father.  Based on the timing of these statements and the contradictory facts in this affidavit, Your Affiant submits that these

---

[5] The Criminal Complaint charging Topaz contained several references to DEFENDANT SAADEH as an unnamed coconspirator.

statements were conceived by DEFENDANT SAADEH to distance himself from his coconspirators and to mask his participation in the conspiracy to provide material support to ISIL.

### I.     Additional Information Demonstrating the Conspiracy to Provide Material Support to ISIL and Corroborating Individual 1, Individual 2, and Individual 3

42.     As summarized below, various sources of information, including electronic communications, social media postings, CC-1's Internet search and browsing activity, forensic examination of computers, and pen register data and toll records further demonstrate the Subjects' conspiracy to provide recruiting services and personnel to ISIL.  This information also corroborates the statements of Individual 1, Individual 2, and Individual 3.

*Electronic Communications*

43.     On June 17, 2015, FBI/JTTF personnel executed search warrants at Topaz's residence in Fort Lee, New Jersey and interviewed him.  Pursuant to this legal authority, members of law enforcement searched his cellular phone (the "Topaz Phone").  A cursory review of the Topaz Phone has revealed numerous communications, including communications related to Topaz's efforts, plans, and intent to travel to Iraq and/or Syria for the purpose of joining ISIL.  For example:

a.     On May 1, 2015, Topaz discussed CC-1's plan to travel and join ISIL over the Topaz Phone.  CC-1 sent a message stating that he would be leaving in a few days and asked, "[d]id you do what i [sic] advised you to do." Topaz responded, "I'm saving my money for it bro trust me I got it."

33

b.     On May 3, 2015, just two days before CC-1 left the United

States, Topaz and CC-2 exchanged the following messages.  CC-2 wrote, "I'm

seeing [CC-1] tomorrow" and then CC-2 asked Topaz to join them.  CC-2

further stated, "we can't discuss ur [sic] "trip" without u [sic]."

c.     The next day, on or about May 4, 2015, Topaz sent the

following message to CC-2:

> And bro I'm not sure how much longer I can take not being in the
> dawla [*transl.* "state," referring to ISIL] honestly, everything is so
> accessible and unchangeable and excessive in America that I feel
> any much longer I'm over here I might just start fasting to get
> much closer to God . . . . And I can't be any more serious like I'm
> beyond frustrated with everything.

CC-2 replied that Topaz's feeling was shared by "all of us" before adding: "It

takes us less than one day to reach dawla [*transl.* "state," referring to ISIL] from

when we board the plane at JFK airport to making sujud [referring to a daily

Islamic prayer] in the Islamic land."  Topaz then stated that he had his

passport but needed cash to purchase his ticket.  CC-2 replied, "My trip is

looking months away[.]  if u can take a loan out for 5k or even 2.5k then ur

[sic] good, they take US dollars in dawlah [*transl.* "state," referring to ISIL] so u

can eat and buy stuff, and they provide u with housing when u reach the land

of Islam."  Topaz thereafter asked: "Will we all be communing together Insha'

Allah [*transl.* "God willing"] in Turkey before going to dawlah [*transl.* "state,"

referring to ISIL][?]  Just curious because I want to meet the other brothers

Insha'Allah[.]"  CC-2 replied, "Most likely [CC-1] will be there first, i will stay in

contact with him, in sha Allah, and then we will one by one meet at a spot

agreed on."  CC-2 added, "you can walk easy into Turkey."  Topaz replied,

34

"Word up . . . it should be a breeze[.]" CC-2 then wrote: "[a]fter [CC-1] leaves, U [sic] Me and [DEFENDANT SAADEH] are gonna meet up to talk about getting u guys across, . . . Then ur [sic] gonna enter the land of no music, and no Preverts [sic] taking girls out to violate them, no intoxication, no Filth, period! Allahu akbar! [transl. "God is the greatest"].

        d.     On May 15, 2015, over the Topaz Phone, Topaz wrote a message to CC-2. In this message, Topaz stated "I'm trying to get everything together for hijra[6] but the money isn't coming fast[,] Akh [transl. "brother"]. Topaz added that he was trying to work at a relative's restaurant to earn money to "make hijra soon."

        e.     On June 15, 2015, over the Topaz Phone, Topaz exchanged messages with another individual. That individual wrote that CC-2 had not been responding to text messages or answering his phone.[7] Topaz wrote that he was unable to reach CC-2, and when he tried to call CC-2 the phone just hung up. Topaz then wrote, "We gotta leave ASAP." Later in this exchange, that individual responded, "Well all I know is that we gotta meet soon before anyone else suddenly disappears[.]"

---

[6] As noted in footnote 2 above, based on my training and experience, and knowledge of the investigation, I believe that "hijra" means to migrate or travel and that, in this context, Topaz and CC-2 were referring to traveling to the region of Iraq and Syria controlled by ISIL. As discussed in paragraph 32 below, Topaz stated to the FBI/JTTF this was what he and his co-conspirators meant when using the term "hijra."

[7] As noted above, CC-2 was arrested on June 13, 2015. Media reports related to his arrest appeared for the first time on June 15, 2015.

44.   A search warrant for one of CC-1's social media accounts revealed

the following communications between CC-1 and CC-2:

- On November 25, 2012, a discussion related to Anwar Al-Awlaki ("Al-Awlaki")[8] in which CC-1 stated: "America killed him [referring to Al-Awlaki]." CC-2 responded: "then amreeka [referring to the United States of America] shale [sic] burn[.]"

- On March 12, 2013, a discussion related to the nascent Syrian civil war in which CC-1 and CC-2 stated that the recent events signaled the coming of "the end." They discussed the Mahdi – the prophesied redeemer of Islam who would arise before the Day of Judgment. CC-1 stated how he and CC-2 have been "chosen to be the army of the "M[a]hdi . . . [.]. They then discussed building "small army" that would include their friends. CC-1 stated he wanted to be general in the Mahdi's army and CC-2 stated he wanted to be the lead weapons maker/designer for it. CC-2 added: "think of it, it will prob[a]bly be like 2-4 yrs from now, we will be in the prime of our lives[.]"

- On June 18, 2013, a discussion about a leak of information concerning the National Security Agency and certain Internet service providers in which CC-2 claimed one provider gave "all of its information" to the United States government. In response, CC-1 stated "man I feel[ ] its really hop[e]less to try to oppose these people [apparently referring to the United States government][.]" CC-2 responded by stating "What can we do?" and "really want to leave this country[.]" In turn, CC-1 stated: "in shaa ALLAH [*transl.* "God willing"] why leave[?] **we already infiltrated**" (emphasis added). CC-2 responded: "Truu [an apparent misspelling of "true"][.] Now we finish this conversation in person[.]"

---

[8] Al-Awlaki was a dual citizen of the United States and Yemen, and an Islamic lecturer and a leader within AQAP, a Yemen-based terrorist group that had claimed responsibility for terrorist acts against targets in the United States, Saudi Arabia, Korea, and Yemen since its inception in January 2009. Pursuant to a Presidential Executive Order, Al-Awlaki was designated by the United States as a "Specially Designated Global Terrorist" on July 12, 2010. Al-Awlaki was reportedly killed in Yemen on September 30, 2011. Al-Awlaki's lectures have advocated for Muslims in the West to engage in violent jihad without waiting to receive sanction or tasking from a leader or established group.

- On June 27, 2013, CC-1 sent CC-2 a photograph of Usama Bin Laden that was taken when he was a young man. In response, CC-2 stated that this photo is "another reason they [apparently referring to the United States government] should think im a terrorist[.]"

- On January 29, 2014, a discussion in which CC-2 stated he (CC-2) has been watching lectures by Al-Awlaki and in which CC-1 responded that he (CC-1) has watched "almost all of his lectures." In this exchange, CC-2 stated that Al-Awlaki did nothing other than give lectures and this was the reason Al-Awlaki was killed.

*Social Media Postings*

45.     Individual 1 provided consent for the FBI/JTTF to access Individual 1's Facebook account. Prior to May 5, 2015, Your Affiant accessed Individual 1's Facebook account and reviewed CC-1's Facebook account and confirmed that both accounts are linked as "friends." Moreover, Your Affiant observed the following items on CC-1's Facebook account:

- On July 1, 2014, (the approximate date on which ISIL's leader declared an Islamic caliphate in Syria and Iraq) CC-1 posted images of the flag of the ISIL and the flag of the Islamic Khilafa [*transl.* "Caliphate"] on his Facebook account.

- On February 3, 2014, photos of CC-1 and CC-2 together were posted on the CC-1's Facebook account.

- On March 2, 2014, CC-1 and Topaz were tagged in the same photo on CC-1's Facebook account

A recent attempt to view CC-1's Facebook account in connection with this investigation was unsuccessful as it appears that CC-1 deleted his account just prior to his departure from the United States.

46.     Your Affiant has reviewed Topaz's Facebook account, which revealed "selfies" (photos taken by Topaz of himself) of Topaz wearing head and face coverings similar to those worn by jihadist fighters. Topaz captioned the

selfies with the following message: "Which assassin am I, or am I all of them?"
Also observed on Topaz's Facebook page were messages that confirmed Topaz's
intention to travel soon to the Middle East. In those messages Topaz stated
that he intends to travel to Jordan, however, your Affiant respectfully submits
based on all of the facts set forth in this Affidavit there is probable cause to
believe that this is not true and that Topaz is employing a cover story to hide
his true intention to travel to territory that ISIL claims to control and provide
material support to ISIL. The use of such cover stories is recommended by ISIL
to its recruits to help them evade detection and has been seen in other
FBI/JTTF investigations involving individuals who travel from Western
countries to provide material support to terrorist organizations

     47.    The FBI/JTTF has reviewed social media postings by CC-2 that
revealed his violent jihadist ideology and in particular his support for ISIL. For
example, on or about September 10, 2014, CC-2 posted[9] the following message
on a social media service: "i fear AQ could be getting too moderate." I believe
that "AQ" is used to refer to al-Qaeda. On or about February 3, 2015, CC-2
posted, "Subhan Allah [*transl.* Glorious is God"], IS [referring to ISIL] is known
for their high end videos, great weaponry, and quality fighters." In another
posting on or about the same day, CC-2 wrote "Khilafah [*transl.* "caliphate,"
referring to areas of Syria and Iraq claimed by ISIL to be under its control]
offers us to live under the laws Allah prescribed for us, if we fear him we would

---

[9] To publish these messages, CC-2 used accounts that, according to Internet
Protocol information were created at CC-2's verified home address.

rush to the land to be governed by it."  In other tweets in January and

February 2015, CC-2 expressed support for the attack in Paris on the staff of a

satirical magazine; the execution of the Jordanian Air Force pilot by ISIL; the

beheading of a Korean journalist by ISIL; and the establishment of an ISIL

military presence and Sharia law in New York City.

   *CC-1's Internet Search and Browsing Activity*

   48.   A search warrant revealed records of Internet search and browsing

activity attributable to CC-1.  Those records included the following activity,

among others:

- On June 29, 2014, a visit to a web page containing an article containing "new rules" issued by ISIS for those living under their control in the caliphate;

- On January 26, 2015, a visit to a web page containing an online encyclopedia article on "Ansar al-Islam," a foreign terrorist organization designated by the United Sates Department of State on March 22, 2004, which, according to open sources is active in Iraq and Syria and has fought against coalition forces allied with the United States;

- On January 28, 2015, a visit to a web page containing a video of a speech given Al-Awlaki titled "The Dust Will Never Settle Down."  In the speech Al-Awlaki urged the killing of any individual who spoke against or defamed the Prophet Mohammed.  "Harming [by defamatory words] Allah and his Messenger is a reason to encourage Muslims to kill whoever does that."

- Between February 6 – 16, 2015, searches relating to ISIL's execution of a Jordanian Air Force pilot by burning him alive.

- On February 16, 2015, a visit to a web page containing graphic video of the pilot's murder by ISIL militants.

- On March 2, 2015, a search for the term "ISIS" and a visit to a page on the website of a New York-based newspaper aggregating articles related to ISIL.

- Between April 19 – 20, 2015, multiple searches for airline tickets to Turkey, including queries for "turkey two-way tickets."[10]

- On April 19, 2015, a visit to a web page for a discount travel company containing the results of a query for airline tickets from the United States to Istanbul, Turkey for one person departing between May 15 and June 3, 2015.

- On April 23, 2015, a visit to a web page containing, among other things, an hour-long English version of an ISIL propaganda video. The video depicts ISIL militants engaged in bombings, shootings, executions, kidnappings, and beheadings.

*Computer Forensics*

49.     Acting with the consent of Individual 1, the FBI/JTTF obtained Individual 1's home computer, which he/she had seen CC-1 using after coming to live at his/her residence in February 2015.  A forensic examination of the computer revealed numerous files and artifacts indicating that the computer had recently been used to conduct research regarding ISIL.

a.     A file dated March 3, 2015 revealing that Google searches had been conducted on that date for "Map of ISIS" and "Map of ISIS 2015."

b.     Numerous image files depicting areas of Syria and Iraq that ISIL claims to control that were apparently viewed on March 3, 2015.  Some of the images are consistent with maps published in the mainstream media, while

---

[10] As discussed above, ISIL instructs recruits traveling from Western countries to evade scrutiny by using cover stories to hide the illegal purpose of their travel.  Making travel arrangements that are consistent with those cover stories is also a technique recommended by ISIL.  For example, an ISIL recruit who booked a round-trip ticket to Turkey would stand a better chance of persuading officials that he intended to return to the United States rather than joining the terrorist group in Syria or Iraq.  In addition, in my training and experience, round-trip tickets can be less expensive than one-way tickets.

others are consistent with ISIL propaganda because the maps feature cropped images of jihadist fighters and other ISIL imagery pasted into the maps.

      c.    A file showing that on March 25, 2015 the computer's Internet browser navigated to a news article about an ISIL supporter. That article reported about how private researchers tracked the ISIL supporter's movement using her postings on social media. The article was titled: "ISIS Sympathizer's Road to Jihad — From Canada to Syria to Iraq — Tracked one Tweet at a Time."

*Pen Register Data and Toll Records*

50.    The FBI/JTTF has obtained pen register and toll data for phones used by CC-1, DEFENDANT SAADEH, Topaz, and CC-2.   That review revealed the following:

- From October 1, 2014 through April 28, 2015, a phone used by CC-1 throughout 2014 and up until mid-April 2014 (call number 201-258-9417) had:

  - 173 voice calls and 309 text messages with DEFENDANT SAADEH;

  - 202 voice calls and 10 text messages with Topaz; and

  - 116 voice calls and 411 text messages with CC-2.

- From April 22, 2015 through June 3, 2015, a phone used by CC-1 beginning in mid-April 2014 (call number 201-245-1125) had:

  - 114 voice calls and 28 text messages with DEFENDANT SAADEH;

  - 38 voice calls and 12 text messages with Topaz; and

  - 132 voice calls and 168 text messages with CC-2.

- From January 1, 2015 through June 9, 2015, DEFENDANT SAADEH's phone (call number 201-660-2858) had:

  - 154 voice calls and 54 text messages with CC-1;

- 33 voice calls and 4 text messages with Topaz; and

- 3 voice calls and 0 text messages with CC-2.

• From February 18, 2015  through June 9, 2015, Topaz's phone (call number 201-233-6337) had:

- 29 voice calls and 10 text messages with CC-1;

- 16 voice calls and 41 text messages with DEFENDANT SAADEH; and

- 18 voice calls and 63 text messages with CC-2.

### J.    CC-2's Post-Arrest Statements

51.   As noted above, CC-2 was arrested on June 13, 2015.  Following his arrest, CC-2 waived his *Miranda* rights and agreed to make statements. CC-2 stated that he had pledged allegiance to ISIL and was a "full-fledged" member of ISIL.

52.    CC-2 stated he accompanied CC-1 to the airport when CC-1 left for Jordan.  CC-2 further stated that CC-1 planned to travel to the caliphate after arriving in Jordan.  CC-2 also stated that he accompanied CC-1 while shopping for items that CC-1 would need if he were "drafted" to go to war, including hiking boots and a hydration pack.

53.    Finally, CC-2 stated that he had watched ISIL videos with CC-1 and Topaz.

### K.    Topaz's Statements to the FBI/JTTF

54.    As stated above, on June 17, 2015, FBI/JTTF personnel executed search warrants at Topaz's residence in Fort Lee, New Jersey.  In interviews during and after the search, Topaz  provided the following information in response to questioning by FBI/JTTF personnel:

- Topaz sympathized with ISIL and its activity and was aware that ISIL claimed to hold territory in Syria and Iraq;

- Topaz stated that he watched ISIL videos with CC-1, CC-2, DEFENDANT SAADEH including videos that depicted beheadings;

- Topaz discussed with each of CC-1, CC-2, and DEFENDANT SAADEH their desire to join ISIL and plans to travel to reach ISIL by transiting through intermediary countries;

- In those conversations, Topaz stated his agreement with CC-1, CC-2, and DEFENDANT SAADEH to travel with them to join ISIL; and

- Topaz, CC-1, CC-2, and DEFENDANT SAADEH used the term "hijrah" in their discussions and communications to refer to the act of traveling to the "Islamic State" (meaning ISIL).

## CONCLUSION

55.     Accordingly, Your Affiant respectfully requests that the Court approve the Criminal Complaint.

43